## Case No. 18,263.

### CHARGE TO GRAND JURY—FUGITIVE SLAVE LAW.

#### [1 Spr. 593.][1]

District Court, D. Massachusetts. March, 1851.

TREASON AGAINST THE UNITED STATES— RESISTANCE TO THE EXECUTION OF A LAW.

[1. A mere treasonable conspiracy, whether for the purpose of entirely overthrowing the government, or to prevent the execution of any of its laws, is not sufficient to constitute the crime of treason, as defined by the constitution of the United States. In addition to the conspiracy, there must be an actual assemblage of men for the purpose of carrying the conspiracy into effect by force.]

[2. A conspiracy to prevent, by force, the execution of any one law of the United States in all cases, is a treasonable conspiracy; and if there be an actual assemblage of men for the purpose of carrying this intention into effect,—that is, of acting together, and preventing by force the execution of the law generally,—this constitutes a levying of war, and involves the crime of treason.]

[3. The sudden outbreak of a mob, or the assembling of men, in order, by force, to prevent the execution of a law in a particular instance, and then to disperse, without any intention of continuing together or reassembling for defeating the law generally and in all cases, is not a levying of war such as constitutes treason.]

The fugitive slave law, passed in September, 1850 [9 Stat. 462], was received, in Massachusetts, with almost universal regret and disapprobation. With not a few, it produced great excitement and exasperation. Some openly avowed a determination to resist it by violence, declaring that it was a matter of conscience not to permit it to be executed. In the following February, a negro, by the name of Shadrach, was arrested in Boston, as a fugitive slave, and carried into the United States' court rooms for examination before a commissioner. A mob broke into the room, took him by force from the officers of the law, and effected a rescue. At the opening of the next regular term of the district court, in March, SPRAGUE, District Judge, delivered the following charge to the grand jury:

The office you now hold demonstrates that the constitution has established, not a mere confederacy of states, but a government acting directly upon individuals, with a legislature to enact laws, a judiciary to expound them, and an executive to enforce them. Under this government, the people of the United States have enjoyed a greater degree of liberty, prosperity, and happiness, than have been enjoyed by any other people in the history of the world. To preserve this government, it is necessary that its laws should be faithfully executed, and you are now called upon, under the highest sanction, to aid in this indispensable work.

I think it proper, at this time, to call your attention particularly to that part of the Criminal Code, which prohibits and punishes forcible resistance to the laws. Government is so great a blessing, that the highest crime which can be committed, is treason. This is defined by the constitution itself in the following words: "Treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort." [Const. art. 3, § 3.] What amounts to levying war? This question arose soon after the adoption of the constitution, in the several trials of Mitchell, Vigol, and Fries, for being engaged in the Pennsylvania insurrection, against the law imposing a duty upon distilled spirits, under the administration of Washington, and subsequently, in the trial of Aaron Burr, in the year 1807, and in the case of U.

[1] [Reprinted by permission.]

S. v. Hoxie [Case No. 15,407], in the year 1808. These were all trials in the circuit court. The only case which has come before the supreme court, was that of Ex parte Bollman, 4 Cranch [8 U. S.] 125. In this case it was decided that, "if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose," this is levying war. What is a treasonable purpose? If the object be entirely to overthrow the government, at any one place, by force, as at New Orleans, which is the case mentioned by the supreme court, that is a treasonable purpose. But a conspiracy to do this, and actually enlisting men who never assemble, is not sufficient to constitute the crime of treason. There must be an actual assemblage of men, for the purpose of carrying the conspiracy into effect by force. So also, it is a treasonable purpose, if the object be to prevent, by force, the execution of any one law of the United States, in all cases;—for it is entirely to overthrow the government as to one of its laws. And if there be an actual assemblage of men, for the purpose of carrying such an intention into effect, that is, of acting together, and preventing, by force, the execution of the law generally—in all cases it will constitute a levying of war. But the sudden outbreak of a mob, or the assembling of men in order by force to defeat the execution of the law, in a particular instance, and then to disperse, without the intention to continue together, or to re-assemble for the purpose of defeating the law generally, in all cases, is not levying war. If war be actually levied, persons may be guilty, although not present with the force actually assembled. "All those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors."

There are minor offences created and defined by acts of congress alone. By St. April 30, 1790, c. 9, § 22 [1 Stat. 117], it is enacted: "That, if any person or persons shall knowingly and wilfully obstruct, resist, or oppose any officer of the United States, in serving or attempting to serve or execute any mesne process, or warrant, or any rule or order, of any of the courts of the United States, or any other legal or judicial writ or process whatsoever, or shall assault, beat or wound any officer or other person, duly authorized in serving or executing any writ, rule, order, process, or warrant aforesaid, every person so knowingly and wilfully offending in the premises, shall, on conviction thereof," be punished by fine and imprisonment.

Thus you perceive, that, for more than sixty years, indeed, from the foundation of the government, it has been a criminal offence to resist, or oppose, or obstruct the marshal in the execution of a warrant or other legal process; and so plain is the utility and necessity of this provision, that, during all that time, no voice has been raised against it. So far from impairing the energy with which the laws are to be executed, the people, by their legislation, have added new sanctions. Thus by St. March 2, 1831, c. 99, § 2 [4 Stat. 488], it is enacted: "That, if any person or persons shall corruptly, or by threats or force, endeavor to influence, intimidate, or impede any juror, witness, or officer, in any court of the United States, in the discharge of his duty, or shall corruptly, or by threats or force, obstruct or impede, or endeavor to obstruct or impede, the due administration of justice therein, every person or persons so offending, shall be liable to prosecution therefor, by indictment."

This salutary enactment to secure the free course of law has been in force for nearly twenty years without objection. But we have recently heard that not only should the courts be impeded in administering the law, but that the marshal should be obstructed, and even resisted by force, in the execution of legal process, because of a recent statute providing for the

arrest and delivering up of fugitives from labor. It is to be observed that this statute subjects no person to arrest, who was not before liable to be seized and carried out of the state; for, ever since the adoption of the constitution, these same persons have been liable to be taken and carried away, by those from whose service they had escaped. For a pre-existing right created by the constitution and affirmed by the supreme court of the United States, congress has provided a new remedy, by legal process to be executed by a public officer, and has added penal sanctions more effectually to ensure the execution of the law. If it have not all the safeguards we could wish, so neither had the statute of 1793 [1 Stat. 302] passed by the fathers of the constitution, with the approbation of Washington, and sustained by the people for more than half a century.

The constitution commands that fugitives from labor shall be delivered up. The supreme court has decided that it belongs to congress to provide the means. Congress has enacted this law. It is imperative, and will be enforced. Let no man mistake the mildness and forbearance with which the Criminal Code is habitually administered, for weakness or timidity. Resistance must make it sternly inflexible.

Discussion is free. Men of all classes and of every shade of opinion may, by argument or even declamation addressed to the reason or the passions, endeavor to impress new views upon the public mind. But if, in their opposition to the expressed will of society, they pass from words to deeds, and embody mischievous doctrines into criminal acts of resistance to law, whoever they may be, and whatever may be their position or their ultimate purposes, they must sooner or later find that the law is irresistible and overwhelming. The people have been so long accustomed to absolute repose and security under the quiet administration of law, that they are not easily brought to believe that it can be obstructed, much less to contemplate the consequences of its overthrow. But let them be startled by acts of violence and systematic resistance, let it be brought home to them as a practical question, whether they will live under law, administered by responsible public agents, or under the dominion of a mob, impelled by passion, guided by no rule, and subject to no restraint, and they will rush to the support of the constituted authorities, and indignantly repress the spirit of anarchy.

The statute of 1850, c. 60 [9 Stat. 462], after providing that the claimant of a fugitive from labor may have a warrant for his arrest, or seize him without process, proceeds, in the seventh section, to enact, "That any person, who shall knowingly and willingly obstruct, hinder or prevent such claimant, his agent or attorney, or any person or persons lawfully assisting him, her or them, from arresting such a fugitive from service or labor, either with or without process as aforesaid, or shall rescue, or attempt to rescue, such fugitive from service or labor, from the custody of such claimant, his or her agent or attorney, or other person or persons lawfully assisting as aforesaid, when so arrested, pursuant to the authority herein given and declared; or shall aid, abet, or assist such person so owing service or labor as aforesaid, directly or indirectly, to escape from such claimant, his agent or attorney, or other person or persons legally authorized as aforesaid; or shall harbor or conceal such fugitive, so as to prevent the discovery and arrest of such person, after notice or knowledge of the fact that such person was a fugitive from service or labor as aforesaid, shall for either of said offences be subject to" fine and imprisonment.

I have thus, as I proposed, called your attention to certain acts of congress and provisions of the constitution. They are the law of the land, and it is our most solemn duty faithfully to execute them. In the words of the oath which you have just taken, you are to do this, "without fear, or favor, affection, or hope of reward," presenting "things truly as they come to your knowledge, according to the best of your understanding."

Here I might close; but, as great efforts have been made to convince the public that the recent law cannot be enforced with a good conscience, but may be conscientiously resisted; and an impression may have been made on some of your number, thus presenting an obstacle to the discharge of a plain legal duty, I deem it proper to advert briefly to the moral aspects of the subject.

In this part of the country, the convictions of our understanding, our moral sentiments, and our religious opinions, are adverse to the institution of slavery. Hence some are ready to conclude, in the first place, that the provision of the constitution for delivering up fugitive slaves must be morally wrong; and, in the next place, that laws made to carry it into effect are to be disobeyed and resisted. Neither of these propositions legitimately follows from the premises.

As to the first. The states, without the constitution, would be to each other foreign nations. The first duty of every nation is the preservation and protection of its own citizens. It is for this, primarily, that political societies are formed and their restraints submitted to. If, then, any nation finds that hospitality to foreign fugitives is inconsistent with its own peace and safety, it has a right to refuse such hospitality, and to say, to all such foreigners, we cannot receive you amongst us, and if you come, we must deliver you up to the dominion of your own government; and it may rightfully make a compact with such government for such delivery. Whether the peace and safety of the nation do, in fact, require or authorize such compact, it is for the nation itself to decide, and its decision is to be submitted to and its engagements faithfully performed. Those, therefore, who have the strongest convictions of the immorality of the institution of slavery are not thereby authorized to conclude that the provision for delivering up fugitives slaves is morally wrong, or that our fathers in Massachusetts did not act wisely, justly, humanely, in acceding to the compacts of the constitution.

But, secondly, even those who go to the extreme of condemning the constitution and the laws made under it, as unjust and immoral, cannot, even upon such an assumption, justify resistance. In their views, such laws are inconsistent with the justice and benevolence, and against the will, of the Supreme Law-Giver, and they emphatically ask, which shall we obey, the law of man, or the will of God? I answer, obey both. The incompatibility, which the question assumes, does not exist. Unjust and oppressive laws may, indeed, be passed by human governments. But if Infinite and Inscrutable Wisdom permit political society having the power of human legislation to establish such laws, may not the same Infinite and Inscrutable Wisdom permit and require the individual, who has no such power, to obey them? Can you say that it is His will that we shall rise up in forcible resistance, overthrow the power of the government, and, instead of the peace and security of organized society, introduce the dominion of anarchy and violence? Are such the appointed means for their abrogation? Unjust laws have always existed. Until a recent period, poor and honest debtors were, even here, oppressively imprisoned; and, in England, stealing, to the value of more than a shilling, was punishable with death, and the Code numbered more than one hundred and fifty capital offences. The wise and the good saw that these laws were cruel and unnecessary. They did not rush to arms, or counsel disobedience. But, by the diffusion of knowledge, by reason and persuasion, they changed the public mind, and the laws were peaceably ameliorated. The fruits of justice and benevolence,

like the fruits of the natural world, are to be matured by mild and genial influences. The punishment of death is still inflicted by our laws. Many good men firmly believe that society has no right to take the life of one of its members. With them capital punishment is the highest injustice and the greatest wrong that can be inflicted. But they do not counsel resistance, to convulse society and overthrow the government, but quietly and conscientiously submit to the peaceful execution of the laws.

But we are told by some, that, the law being morally wrong, conscience tells them to resist it. Conscience, indeed, is to be reverenced and obeyed, but still we must remember that it is fallible, especially where the rights of others are concerned, and may lead us to do great injustice. Some have an impression that it is the divinity within them, an unerring and infallible guide. Hence they cannot believe, or conceive, that opposition to their views can be conscientious. It is this lurking fallacy, this tacit assumption of personal infallibility, that makes them intolerant toward others, and inaccessible to argument.

I speak not of those who believe that they have special inspiration from above; that a miracle has been wrought for their guidance. Such are beyond the scope of human reason, and fit subjects either of consecration, or a mad-house, according as their belief is founded on reality or delusion. But, with those who are under the dominion of the established laws of the moral and intellectual world, conscience is fallible. The annals of the world abound with enormities committed by a narrow and darkened conscience. A man may incur great moral guilt, not indeed by following his conscience, but by neglecting the means of rectifying and enlightening it. Its dictates are varied, not only according to moral constitution, but the intellectual power and extent of information of the individual. The purer the motive, the more extensive the knowledge, and the greater the mental ability, the more enlightened will be the conscience, and the more correct its decisions.

The moral faculty or moral judgment being thus fallible, there may be a conflict of consciences. Let me present an illustration. A ship arrives with sick passengers. One class of men insist that the disease is contagious, and that they shall not be permitted to land and spread a general pestilence. Another class insist that it is not contagious, and that it would be cruelty to compel them to remain on ship-board, aggravating their sufferings and their danger. With both it is a question of humanity—of conscience. Again, certain strangers seek an asylum amongst us. One class of our citizens see in them only fugitives from oppression, whom we can easily and securely receive and protect. Another class believe that they bring with them, not physical but moral contagion, that their presence will endanger the public peace and individual safety, that it may embroil us with other states, and bring upon us the sufferings and horrors of external and internal war and convulsions. The one class urge the obligations of hospitality and benevolence, the other the obligations of self-preservation, and the sacred duty of preserving those whom nature and society have committed to their protection. Both are equally sincere, conscientious, and resolute. Which shall yield? Is there no appeal but to force? I answer, yes. And the arbiter must be society,—organized society,—pronouncing its decision through its regularly constituted agents. This is the moral judgment, the embodied conscience, of the political community. To this not only is each individual bound to submit, but it is a new and controlling element in forming his own moral judgment. An act, which before may have been innocent, is now criminal, and its commission not only opposed to the will, but subversive of the order, peace, existence of the political society.

Submission is a moral duty. This is as certain as that the Creator made man a social being, and designed that he should live, not in perpetual anarchy, but in peace and security; for human government is the only means which Infinite Goodness has provided, for preserving us from unceasing conflict and violence. To submit to the law of the land is, then, to obey the will of God.

It may be asked, is resistance never justifiable? Is there no exception? I answer, yes! When oppression present and prospective is so great as to justify a resort to the ultimate right of revolution. But this is not to be done from impulse or feeling, but from the calm and careful consideration of the dangers and difficulties of the proposed remedy. A wise man will reflect that evils, great evils, must exist under every human government; that a perfect fabric cannot be made of imperfect materials, and that, whatever he may attempt, he must still work by and with fallible man, with all his blindness, weakness and passion. If, after a deliberate contemplation of the convulsions and miseries attending the overthrow of the existing government, and the hazards and uncertainties of establishing a better on its ruins, he firmly believes the permanent happiness of the community requires the attempt, he may conscientiously make it. Under a despotism, such a case may occur not unfrequently, but we can hardly suppose it to exist in a republic, where the laws are made by the people themselves, through agents freely appointed for short periods, by frequent elections.

In our own country, if there be any, who, contemplating the infirmities of our nature, the history of our race, what has been accomplished in all ages that have passed, and what is now the condition of mankind under all other political institutions, and looking at our own government, its history and its hopes, its past performance and future promise, can then desire its destruction, in the vain and desperate hope of establishing a better in its stead, they must be inaccessible to reason or remonstrance, and of that unfortunate class in whose minds judgment is dethroned, and monomania hold usurped dominion.